IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARQUIS LEE RAYNER,                  :
                                     :
        Plaintiff,                   :
                                     :        Civil Action
           v.                        :
                                     :        No. 23-5187
THE COUNTY OF CHESTER and            :
DETECTIVE HAROLD DUTTER,             :
                                     :
        Defendant.                   :
                                     :

## MEMORANDUM

**Younge, J.**                                          **May 6, 2025**

## I.      INTRODUCTION

Marquis Lee Rayner was found guilty of murder, robbery, and other related charges. After the District Court denied his habeas petition, the Third Circuit reversed that decision and ordered the court to issue the writ for his release on remand. *See Rayner v. Superintendent Forest SCI*, No. 21-3230, 2023 WL 1433610, at *2 (3d Cir. Feb. 1, 2023). Now, in a civil lawsuit, Rayner alleges that omissions by a County of Chester detective in his affidavit of probable cause, and subsequent testimony consistent with that document, caused him to spend nearly ten years in prison for a crime that he claims he did not commit. These actions, according to Rayner, violated his constitutional rights and protections afforded by state law. Because there are issues of fact for a jury to decide that are material to Rayner's claims, Defendants' Motion for Summary Judgment (ECF No. 31) is granted in part and denied in part. [1,2]

---

[1] When applicable, the Court adopts the pagination supplied by the CM/ECF docketing system, which does not always match the document's internal pagination.

[2] The Court finds this Motion appropriate for resolution without oral argument.  Fed. R. Civ. P. 78; L.R. 7.1(f).

## II.    FACTUAL BACKGROUND

### A.  The Home Invasion, Robbery, and Murder

On June 29, 2012, around 12:30 a.m., three men broke into Dominick William's and Aaron Crawford's apartment in Coatesville, Pennsylvania. (Def.'s Facts in Support of their Motion for Summary Judgment, ECF No. 30 ("Def's Facts") ¶¶ 1, 5). All three intruders carried guns, and all were disguised by t-shirts worn across their faces. (Def.'s Facts ¶ 2). Tragically, upon confronting Williams in the living room of his apartment, one of the gunmen fatally shot him. (Def.'s Facts ¶¶ 1, 3).

The intruders continued through the apartment and confronted Crawford in his bedroom. (Def.'s Exhibit A, Trial Transcript, ECF No. 30-2 ("Def.'s Ex. A"), p. 22). There, one of the gunmen pistol-whipped Crawford and demanded him to "give it up." (Def.'s Facts ¶ 5). After Crawford opened his dresser drawer for him, this gunman, who was not wearing gloves, took a clear plastic jar of marijuana from Crawford's bedroom. (Def.'s Facts ¶¶ 5-6). All three intruders subsequentially fled the apartment. (Def.'s Facts ¶ 6).

### B.  The Criminal Investigation

Around 2:00 a.m. that morning, Coatesville City police officers located a clear plastic jar and a black t-shirt in a row of hedges approximately a block and a half from the crime scene. (Def.'s Facts ¶ 7; Def.'s Ex. A, p. 37-38). Officers then took Crawford to these hedges, where he identified the jar as the one taken from his bedroom and the t-shit as the type of shirt the intruders used to cover their faces. (Def.'s Facts ¶ 8).

A few days later, Detective Kenneth Beam of the Chester County Detectives Forensic Services Unit recovered fingerprints from the jar, which matched those belonging to Dominique Lee, Rayner's half-brother. (Def.'s Facts ¶ 9; Def.'s Exhibit C, Crim Compl. and Affidavit, ECF

No. 30-4 ("Def.'s Ex. C"), p. 9). Thereafter, Detective Bean collected DNA evidence from the t-shirt, and sent it to the State Police Laboratory for analysis. (Def.'s Ex. C, p. 10; Def.'s Facts ¶ 10). The DNA was entered into the CODIS database and identified Rayner as a match with one of at least three DNA profiles on the t-shirt.[3] (Def.'s Ex. C, p. 9; Pl.'s Exhibit A, Boyd Expert Report, ECF No. 36-1 ("Pl.'s Ex. A"), p. 5). Police subsequently corroborated this match by later matching the DNA profile with a buccal swab of DNA from Rayner. (Def.'s Facts ¶ 13).

On January 16, 2013, State Police produced a forensic DNA report that provided several key conclusions. First, "[t]he DNA profile obtained from the lower front of the black t-shirt (item Q1) is consistent with a mixture of at least three (3) individuals." Second, "the major component of this DNA mixture of profile matches the DNA profile obtained from the known reference standard from Marquis Rayner (item K3)."[4] Third, "[t]he probability of randomly selecting an unrelated individual exhibiting this combination of DNA types is approximately… 1 in 7.9 quintillion from the African American population." And finally, "[a]dditional minor/less intense alleles were also present," but "[n]o further interpretation could be made due to the complexity of the mixture from this minor component." (Def.'s Exhibit Q, PSP DNA Analysis, ECF No. 30-18 ("Def.'s Ex. Q"), p. 2-3).

In addition to this report, and over the course of several months, Detective Harold Dutter of the Chester County Detectives and other officials investigated the underlying crimes by collecting evidence and conducting interviews. (Def.'s Facts ¶ 12).

## C. The Affidavit of Probable Cause

---

[3] CODIS is an acronym for Combined DNA Index System, which is a computer software program that operates local, state, and national databases of DNA profiles from convicted offenders, unsolved crime scene evidence, and missing persons. (Def.'s Facts ¶ 11 n.2).

[4] The report lists Item K3 as "One (1) sealed envelope containing a buccal sample from Marquis Rayner[,]" (Def.'s Ex. Q).

On March 11, 2013, a Criminal Complaint was filed in the County of Chester against Rayner, which included an Affidavit of Probable Cause (the "Affidavit") that requested arrest warrants for Rayner, his half-brother Lee, and Camren Horne.[5] (Def.'s Ex. C., p. 2). Detective Dutter signed every page of the Affidavit as the affiant, swearing that the facts in the Affidavit were "true and correct." (Def.'s Ex. C., p. 8).

The Affidavit outlined the officers' investigation and the evidence that was collected. In pertinent part, with reference to the DNA evidence, the Affidavit said "the CODIS database identified Marquis A. Rayner, B/M, DOB: 2/22/1990, PA SID Number [XXXXXXXXX], as a contributor for the major component of the DNA profile."[6] (Def.'s Ex. C., p. 10). The Affidavit does not mention the other key findings from the State Police report, including that the DNA from t-shirt was a mixture of at least three individuals. (Def.'s Ex. C., p. 8-10).

The Affidavit was reviewed and approved by four attorneys before it was submitted to Magisterial District Judge Lori Novak Donatelli. (Def.'s Facts ¶¶ 28, 30). On March 11, 2013, Judge Donatelli reviewed and approved the Affidavit. (Def.'s Facts. ¶ 33).

### D. Grand Jury, Trial, and Appellate Proceedings

On May 9, 2013, a Grand Jury was convened to hear the evidence against Rayner, including testimony from Detective Dutter. (Def.'s Facts ¶ 16; Def.'s Exhibit H, Grand Jury Transcript, ECF No. 41 ("Def.'s Ex. H"), p. 2). The Grand Jury voted to indict Rayner for the murder of Williams and the connected robbery. (Def.'s Facts ¶ 16).

On November 20, 2014, after a three-day trial from November 17th to the 19th, a jury found Rayner guilty of five charges, including murder, robbery, and burglary. (Def.'s Facts ¶¶ 47-48).

---

[5] At some point during the investigation, a witness identified Camren Horne in a photo line-up as one of the disguised assailants. (Def.'s Ex. C., p. 10).

[6] Out of caution, the Court removed Rayner's social security number from this quote.

On April 17, 2015, Judge James MacElree sentenced Rayner to life in prison plus 90 months to 20 years. (Def.'s Facts ¶ 49).

Over the subsequent years, Rayner appealed his conviction up through the Pennsylvania Courts, concluding with the Pennsylvania Supreme Court denying Rayner's Petition for Appeal. *See Commonwealth v. Rayner*, 642 Pa. 63 (2017). Rayner's subsequent Petition for Writ of Certiorari of his conviction was also denied by the United States Supreme Court. *See Rayner v. Pennsylvania*, 583 U.S. 1122 (2018).

Then, on November 9, 2018, Rayner filed a Petition for Writ of Habeas Corpus in this Court. (Def.'s Facts ¶61). On November 23, 2021, Judge Gallagher dismissed the petition with prejudice and issued a certificate of appealability. *See Rayner v. Overmyer,* No. 18-04909, 2021 WL 5495812 (E.D. Pa. Nov. 23, 2021). However, on February 1, 2023, the Third Circuit reversed this decision and the remanded the case to the District Court to issue the writ and order Rayner's release. *See Rayner*, 2023 WL 1433610, at *2.

## III.    PROCEDURAL BACKGROUND

On December 29, 2023, Rayner filed the present lawsuit against the County of Chester (hereinafter "Chester County") and Detective Dutter. (Compl., ECF No. 1). Based on the above facts, the Complaint asserted the following claims: (1) Count I—malicious prosecution in violation of the Fourth and Fourteenth Amendments against Det. Dutter; (2) Count II—deprivation of liberty without due process and denial of a fair trial against Det. Dutter; (3) Count III—municipal liability claim against Chester County; (4) Count IV—civil rights conspiracy claim against Det. Dutter and unnamed Chester County employees; and (5) Count V—"state law claim" against Det. Dutter. (Compl, ECF No. 1). On February 24, 2025, Defendants filed the present Motion for Summary Judgment to have these claims decided in their favor. (Def.'s Brief in Support of Motion for

Summary Judgment, ECF No. 31-2 ("Def.'s Brief")). The Court reviews the parties' arguments below.

## IV.    LEGAL STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 24-49 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id*.

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.,* 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).

In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## V.    DISCUSSION

### A.  Claims Against Detective Dutter

#### 1.  Malicious Prosecution

To plead a malicious prosecution claim under the Fourth Amendment,[7] Rayner must establish that:

> (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; **(3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice**; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

---

[7] Defendants move for summary judgment on Count I, which includes the malicious prosecution claim under the Fourth and Fourteenth Amendments. (Compl., p. 11). In his response briefing, Plaintiff makes no mention of the malicious prosecution claim under the Fourteenth Amendment. (Pl.'s Brief, p. 4-18). Even if he had, Det. Dutter would be protected from the claim through qualified immunity because "it cannot be said that a Fourteenth Amendment right to be free from malicious prosecution was clearly established in [2012]." *Lazar v. City of Philadelphia*, No. 24-907, 2025 WL 886952, at *8 (E.D. Pa. Mar. 21, 2025) (concluding that "[a]lmost every judge in this District has concluded that after *Albright*, there was no clearly established right under the Fourteenth Amendment to be free of malicious prosecutions); *see also Thorpe v. City of Phila.*, No. 19-5094, 2020 WL 5217396, at *16 (E.D. Pa. Sept. 1, 2020) ("Because a Fourteenth Amendment procedural due process right against malicious prosecution was not clearly established in 2008—and is still not clearly established for that matter—the Court grants qualified immunity as to this claim on behalf of all moving individual defendants."). Accordingly, summary judgment for the malicious prosecution claim under the Fourteenth Amendment is granted.

*Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014) (emphasis added). Malicious prosecution claims against police officers (as opposed to prosecutors) generally arise where an officer "fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute." *Thorpe v. City of Phila.*, No. 19-5094, 2020 WL 5217396, at *12 (E.D. Pa. Sept. 1, 2020).

As an initial matter, Defendants insist that Rayner's malicious prosecution claim is a disguised false arrest claim that the Court must dismiss as time-barred. Defendants are correct in one respect. At the time his Complaint was filed (December 29, 2023), if Rayner had alleged a Section 1983 false arrest claim based on his 2014 arrest, the claim would run afoul of the statute of limitations. *See Wallace v. Kato*, 549 U.S. 384, 397 (2007) ("We hold that the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process."); *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) ("The statute of limitations for a § 1983 claim arising in Pennsylvania is two years."). However, contrary to Defendants' position, Rayner is appropriately asserting a malicious prosecution. He claims that Det. Dutter provided false information, through omission, to the Magisterial District Judge in the Affidavit and to the Grand Jury in his testimony. These allegations taken prior to and after Rayner's arrest are consistent with a malicious prosecution claim. *See Halsey*, 750 F.3d at 297 ("If the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution.")

Turning to the merits of Rayner's malicious prosecution claim, Defendants argue that the claim fails as a matter of law because Rayner cannot satisfy the third and fourth elements—lack of probable cause and malice, respectively. To the contrary, there are factual disputes that are material to these elements that a jury must decide.[8]

### i.    Probable Cause

Defendants attest that Rayner's criminal proceeding was initiated with probable cause, which would "negate[]a claim for malicious prosecution." *Teeple v. Carabba*, No. 07-2976, 2009 WL 5033964, at *15 (E.D. Pa. Dec. 22, 2009), *aff'd*, 398 F. App'x 814 (3d Cir. 2010). Probable cause for an arrest "exists if there is a 'fair probability' that the person committed the crime at issue." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016) (quoting *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000)). This happens "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Dempsey*, 834 F.3d at 467 (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995)). Accordingly, a fact finder's determination of probable cause must adhere to a "totality-of-the-circumstances approach," which is "necessarily fact-intensive[.]" *Dempsey*, 834 F.3d at 468.

---

[8] Defendants assumed that Count V, titled as "state law claim," was a malicious prosecution claim under state law and argued that it "fails for the same reasons as the Federal malicious prosecution claim fails." (Def.'s Brief, p. 34). Rayner does not contest this interpretation of Count V, and presented argument in support of a malicious prosecution claim under Pennsylvania law. "A malicious prosecution claim under Pennsylvania law requires a plaintiff to show all but the fifth element (deprivation of liberty)." *Thomas v. City of Philadelphia*, No. 17-4196, 2019 WL 4039575, at *7 (E.D. Pa. Aug. 27, 2019) (citing *Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 791 (3d Cir. 2000)). "The Pennsylvania and federal standards regarding the existence of probable cause are the same." *DeBellis v. Kulp*, 166 F. Supp. 2d 255, 280 (E.D. Pa. 2001) (citing *Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289, 293 (1994)). Accordingly, the Court will analyze these claims together for the probable cause factor and will explain the standards for malice under both laws.

Generally, under this analysis, the court would ask whether a reasonable officer would have found a fair probability that Rayner had committed the murder and robbery. "But when, as here, a judge issues an arrest warrant, [the court must] defer to it unless the officer misrepresented material information to get the warrant." *Pinkney v. Meadville, Pennsylvania*, 95 F.4th 743, 748 (3d Cir. 2024). This determination requires the court to analyze the following two questions: (1) Did Detective Dutter "knowingly and deliberately, or with a reckless disregard for the truth, ma[k]e false statements or omissions that create[d] a falsehood in applying for a warrant?"; and (2) Were those false statements and omissions in the affidavit "material, or necessary, to the finding of probable cause?" *Id.* (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)); *see also Cook v. Tustin*, No. 24-0431, 2024 WL 3460112, at *4 (E.D. Pa. July 18, 2024) (applying this analysis to a malicious prosecution claim); *Jacobs v. City of Philadelphia*, No. 23-1880, 2025 WL 991023, at *7 (E.D. Pa. Apr. 2, 2025) (same). Further, a Grand Jury voted to indict Rayner, so this "grand jury indictment constitutes prima facie evidence of probable cause to prosecute… but that presumption may be rebutted by a plausible allegation that the indictment was procured by fraud, perjury or other corrupt means[.]" *Xi v. Haugen*, 68 F.4th 824, 841 (3d Cir. 2023) (quoting *Rose v. Bartle*, 871 F.2d 331, 353 (3d Cir. 1989) (internal quotations omitted).

### a. Reckless Disregarded for the Truth

Rayner argues Det. Dutter recklessly omitted information about the DNA evidence and descriptions of the alleged suspects in his Affidavit of Probable Cause. "[O]missions are made with reckless disregard when an officer 'omits facts that any reasonable person would know that a judge would want to know.'" *Thomas,* 2019 WL 4039575, at *8 (quoting *Wilson v. Russo*, 212 F.3d 781, 783, 788 (3d Cir. 2000)).

Here, the Affidavit included *some* facts that were relevant to determining the fair probability that Rayner was culpable for the underling crimes, but *not all* of them. The Affidavit included the following information: (1) Rayner was adjudicated delinquent for an armed robbery in 2005; (2) Witness #1 described the three suspects, including that some covered their faces with a black t-shirts, and a timeline of their actions in the apartment; (3) A black-t-shirt and a jar were found in close proximity to the apartment and were collected as evidence; (4) Witness #2 identified the jar that was found as something that one of the suspects had taken; (5) CODIS database identified Rayner as a "contributor for the major component of the DNA profile" collected from the black t-shirt; (6) The DNA found on the black t-shirt matched DNA collected from a buccal swab that Rayner provided the police; (7) Rayner and Dominique Lee are brothers that are living together; (8) Witness #4 said that they had information related to the murder/robbery, including that Camren Horne told Witness #4 that he and three other people (four total) were involved in the crime. Horne told Witness #4 that Lee was one of the assailants; and (9) Lee's fingerprints matched the prints on the jar. (Def.'s Ex. C, p. 8-10). Detective Dutter *did not* include the following facts from the State Police's DNA Report in the Affidavit: (1) The DNA mixture extracted from the black t-shirt contains DNA from at least three individuals; and (2) The "[a]dditional minor/less intense alleles were also present," but "[n]o further interpretation could be made due to the complexity of the mixture from this minor component." (Def.'s Ex. Q, p. 2-4).

Because of the gravity of DNA evidence in a fact finder's determination of culpability, *see Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 62 (2009) ("While of course many criminal trials proceed without any forensic and scientific testing at all, there is no technology comparable to DNA testing for matching tissues when such evidence is at issue. DNA testing has exonerated wrongly convicted people, and has confirmed the convictions of many

others.") (internal citations omitted), a reasonable jury could conclude that "a judge would want to know" these additional details about the DNA evidence. *Wilson,* 212 F.3d at 783. Specifically, a jury could infer that this information would have provided Judge Donatelli a complete understanding of the DNA evidence—that DNA from three individuals were present on the t-shirt and the portions that did not match with Rayner were too complex to interpret. Thus, on account of these omissions in the Affidavit, a jury could find that Det. Dutter recklessly disregarded the truth. *See Pinkney*, 95 F.4th at 748.

Defendants argue that "the affidavit of probable cause clearly identified Plaintiff as [a] major contributor which unambiguously means there is a minor contributor." (Def.'s Brief, p. 19). In essence, Defendants dispute whether there was an omission of information. In support of their claim, Defendants note that several individuals involved in the criminal proceedings understood that "major" meant that there was other DNA found as a minor contributor. (Def.'s Brief, p. 19). Defendants point to the testimony of Samuel Stretton, Rayner's defense attorney at his trial, to make this point. When asked what "major component" meant to him, Mr. Stretton said the following:

> "Major component meant to me at that time the things that really counted in making the evaluation. Maybe there was some minor things that was different, but the major things, put it in his family and according to them, couple trillion probabilities that it was him. That's how I interpreted it."

(Def.'s Exhibit P, Stretton Deposition, ECF No. 30-17 ("Def.'s Ex. P"), p. 10). Mr. Stretton's conclusion that "maybe there was some minor things that were different" cannot be clearly understood as him claiming that the phrase implied that the DNA mixture was from at least three individuals and the minor contributor's profiles could not be interpreted. To the contrary, his

testimony highlights that the phrase falls short of a complete explanation of the DNA evidence. At minimum, the question of whether the statement in the Affidavit implies the omitted information, as Defendants argue, is a disputed fact for a jury to decide.

Defendants also claim, without pointing to any caselaw, that Det. Dutter could not have recklessly disregarded the truth in the Affidavit because multiple attorneys from the Chester County District Attorney's office reviewed it prior to its submission to the Judge Donatelli. However, this Court has not found precedent that requires courts in this Circuit to apply such a rule. Det. Dutter affixed his signature attesting to the truth of facts contained in the Affidavit, (Def.'s Ex. C, p. 8-10), so this Court must assume that he had the final review of the information that was included or omitted. Ultimately, it is this final decision to present the information in the Affidavit to the Judge Donatelli that a jury could consider a reckless a disregard of the truth.

### b. Material/Necessary for Finding Probable Cause

Having found that there can be a determination that Det. Dutter recklessly disregarded the truth by omitting facts related to the DNA evidence, the Court must now determine whether those omissions were "material, or necessary, to the finding of probable cause." *Wilson*, 212 F.3d at 789. First, "[t]o determine the materiality of the misstatements and omissions," the Court must "excise the offending inaccuracies and insert the facts recklessly omitted." Id. Then, the Court "consider[s] whether the revised facts and circumstances would have suffic[ed] in themselves to warrant a reasonable person to believe" that there was a fair probability that Ranyer committed the murder/robbery. *Pinkney*, 95 F.4th at 749.

The Third Circuit notes that a "certain tension exists when probable cause is at issue in a motion for summary judgment," and specifically highlights this tension "for analyses that center upon misrepresentations and omissions in the affidavit of probable cause." *Andrews v. Scuilli*, 853

F.3d 690, 698 (3d Cir. 2017). Thus, "where the question is one of probable cause, the summary judgment standard must tolerate conflicting evidence to the extent it is permitted by the probable cause standard." *Dempsey,* 834 F.3d at 468. The court must "view *all* such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a 'fair probability' that a crime occurred." *Id.* Only under this evaluation, could "the existence of conflicting evidence rise to the level of a 'genuine dispute as to any material fact' such that summary judgment would be inappropriate." *Id.*

Here, if the Affidavit were to include the omitted information about the DNA evidence, the following paragraph that outlined the DNA evidence would have the bolded insertions:

> **The DNA profile from the lower front of the black t-shirt (item Q1) is consistent with a mixture of a at least three (3) individuals.** DNA collected from the tee-shirt was entered into CODIS, a known offender database. The CODIS database identified Marquis A. Rayner, B/M, DOB: 2/22/1990, PA SID Number [XXXXXXXXX], as a contributor for the major component of the DNA profile. **There were additional minor/less intense alleles present, but no further interpretation could be made due to the complexity of the mixture from this minor component.** On December 4, 2012, a buccal swab was obtained from Marquis Rayner for a confirmatory check with the CODIS match. On a report dated January 16, 2013, the Pennsylvania State Police DNA Lab confirmed that the DNA found on the black tee shirt matched the known DNA buccal sample obtained from Marquis Rayner.

(Def.'s Ex. C, p. 8-10; Def.'s Ex. Q, p. 2-4).

After these facts are added to the Affidavit and considered in conjunction with all the facts therein, a jury could determine that "no reasonable competent officer would conclude that probable cause exist[ed]" to initiate a criminal proceeding against Rayner. *Wilson*, 212 F.3d at 789–90 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)) (internal quotation marks omitted). In an area close to the crime scene, officers found two things: (1) a jar that one witness identified as an item that was stolen from his apartment; and (2) a black t-shirt that matched the description of an item that one witness said the suspects were wearing to cover their faces. A sample extracted from said t-shirt contained a mixture of DNA from at least three people, of which, police were able to match the major component of the mixture with Rayner's DNA. However, as pointed out by the Third Circuit in its opinion of Rayner's habeas case, the presence of Rayner's DNA does not conclusively mean that Rayner wore it in the commission of the crime because "there was no way to determine when Rayner's DNA had been deposited on the shirt." *Rayner*, 2023 WL 1433610, at *2. In fact, "[t]he DNA could have been left on the t-shirt—an easily movable object—*at any time.*" *Id.* The probability that the DNA from Rayner was left on the t-shirt during the crime is complicated by the fingerprints from the jar that matched Dominique Lee, who was Rayner's half-brother and roommate at the time. As the Third Circuit notes, "Lee could have easily borrowed Rayner's t-shirt sometime before the commission of the crimes." *Id.* This scenario is supported by information from Witness #4, who identified Lee and Camren Horne as potential assailants, explaining that they were dressed in black clothes at Lee's apartment prior to the murder/robbery. In other words, because Witness #4 placed Lee at the apartment he shared with Rayner, it is more likely that Lee could have used one of Rayner's t-shirts that already contained Rayner's DNA. The omitted evidence, which explains that at least two other DNA profiles were present on the t-shirt, further supports that someone else was using his shirt. Whether one of those DNA profiles

belonged to Lee could not be confirmed or denied because the complexity of said profiles did not allow for interpretation. Nevertheless, the presence of another DNA profile alone fits this plausible scenario, which then undermines probable cause against Rayner. Accordingly, when the Affidavit includes information that at least two other DNA profiles were present on the t-shirt, Rayner's culpability for the murder/robbery can be understood as speculation rather than a fair probability. Absent the direct link to the crime through Rayner's DNA that the original Affidavit suggests, which is undermined by the omitted evidence, the Affidavit does not include other evidence that reasonably links the murder/robbery to Rayner. This evidence could allow a jury to find that no officer could have reasonably found that there was probable cause against Rayner.

In support of a finding of probable cause, Defendants outline an interpretation of the facts in the Affidavit that would lead a jury to find in their favor. They argue that when information about the "two other unidentified 'minor' contributions" are added, it "negate[s]" probable cause because of the "DNA evidence on the t-shirt which was linked to the jar taken during the robbery, fingerprints identified as Dominque [sic] Lee, who was Plaintiff's half-brother and roommate." (Def.'s Brief, p. 12-13). As explained above, when reasonable inferences are drawn in Plaintiff's favor as the nonmoving party, a jury could find that this evidence "undermine[s] a finding of probable cause." *Bircher v. Pierce*, 610 F. App'x 194, 197 (3d Cir. 2015). Information about the two other DNA profiles complicates the link to Rayner that the Defendants sets out. While "some unreliability or exculpatory evidence will not fatally undermine probable cause otherwise established," absent that evidence, the standard must still be "otherwise established." *Dempsey*, 834 F.3d at 478 (internal quotations omitted and insertion accepted). Because there is a genuine dispute over how this added information impacts the existence of probable cause, the question must be presented to a jury.

### c. Grand Jury Indictment

Finally, Defendants argue that there is *prima facie* evidence of probable cause because a Grand Jury voted to indict Rayner. (Def.'s Brief, p. 16). This "presumption of probable cause" can be overcome if there is evidence that the indictment was the result of "fraud, perjury or other corrupt means." *Costino v. Anderson*, 786 F. App'x 344, 347 (3d Cir. 2019). The Third Circuit has "previously held that when a grand jury [indictment] contains facts supporting probable cause, a failure to provide exculpatory evidence to the grand jury does not demonstrate that the [indictment] was procured by fraud, perjury or other corrupt means." *Rodgers v. Pennsylvania State Police*, No. 24-1759, 2025 WL 729497, at *2 (3d Cir. Mar. 7, 2025) (citing *Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d 345, 363 (3d Cir. 2003)). In *Camilo*, the Third Circuit granted summary judgment for a malicious prosecution claim because the plaintiff could not rebut the presumption of probable cause. 334 F.3d at 363. The Circuit *first* held that there "were ample facts to support a finding of probable cause." *Id.* Then, when plaintiff argued that the presumption was overcome because "exculpatory evidence was not presented to the grand jury," the Circuit declined to override the presumption because (1) the exculpatory evidence was presented; and (2) courts have no authority to require a prosecutor to present exculpatory evidence to a jury. *Id.* Accordingly, the Circuit held that the plaintiff "did not demonstrate that he was prosecuted without probable cause." *Id.*

In this case, unlike *Camilo*, there is a dispute of fact whether there were ample facts to support a finding of probable cause against Rayner. Without this determination, Det. Dutter's failure to present exculpatory information could indicate fraud. In the Affidavit, as outlined above, Det. Dutter omitted crucial details about the DNA evidence (i.e. that the DNA mixture was from three individuals and that no interpretation could be made of the minor contributors to that

mixture), which disguised a line of reasoning that would have seriously disrupted a showing of probable cause. After Judge Donatelli issued the arrest warrant for Rayner, Det. Dutter then omitted the same exculpatory facts about the DNA evidence in his testimony to the Grand Jury. (Def.'s Exhibit H, p. 137-151; Pl.'s Exhibit B, Dutter Deposition, ECF No. 36-2 ("Pl.'s Ex. B"), p. 247). Just like in the Affidavit, as previously explained, the evidence against Rayner presented to the Grand Jury lived and died with the DNA found on the black t-shirt. When the omitted exculpatory information on the DNA is considered, similar to the Court's analysis of the Affidavit, there is a dispute of fact whether probable cause for Rayner still exists. Det. Dutter's decision to withhold exculpatory information, and ultimately generate a showing of probable cause that might not have been corroborated *but for* this omission, could allow a jury to find that the indictment was obtained by fraud or other corrupt means.

### i.  Malice

Defendants argue that Rayner not only fails to meet his burden of proof on the "probable cause" prong of the malicious prosecution standard, he also cannot demonstrate that Det. Dutter acted maliciously or with a purpose other than bringing Rayner to justice. (Def.'s Brief, p. 18). In other words, Defendants pose the following question—why or for what purpose would Defendants seek to pin this charge on Plaintiff, when there is no evidence that Detective Dutter knew anything about the Plaintiff or even the victim in this case? After all, there is no evidence that Detective Dutter and Rayner had ever previously had any contact with one another. Only the Finder of Fact can ponder why Detective Dutter either failed or refused to alert the Magistrate Judge in the Affidavit of Probable Cause about the presence of DNA from multiple individuals on the sole piece of evidence that connected Plaintiff to the scene of this heinous crime, or whether it mattered. Plaintiff may be able to prove what Detective Dutter did and did not do, but will probably not be

able to conclusively prove why he failed to provide this most important detail to the neutral Magistrate Judge considering the issuance of the warrant. Proving his actions alone may, however, be enough because under this prong, "[a]n officer's decision to omit crucial exculpatory information from [an] affidavit of probable cause can equate to malice." *Staten v. City of Philadelphia*, No. 24-1380, T203 (3d Cir. 2020)) (internal quotation marks omitted). In *Harvard*, for example, an officer omitted and misrepresented important information regarding exculpatory facts in his affidavit of probable cause. *See* 973 F.3d at 203-204. The Third Circuit could not find a "valid reason for why [the officer] would include such grave misrepresentations and falsehoods in the affidavit," so it held that a jury could find that the officer acted maliciously. *Id.* at 204. Further, under Pennsylvania law, "[m]alice may be inferred from the absence of probable cause" or "from a reckless and oppressive disregard of a plaintiff's rights." *Hall v. Peters*, No. 248 C.D. 2017, 2017 WL 5893388, at *11 (Pa. Commw. Ct. Nov. 30, 2017).

Here, as explained, Det. Dutter omitted information about the DNA evidence, which, if otherwise included in the Affidavit, would have created serious doubts about whether Rayner was present during the commission of the crime. A jury can, and perhaps should, interpret Det. Dutter's decision to remove this exculpatory information as Det. Dutter simply choosing to actively mold a finding of probable cause against a third of the possible four suspects. After all, he had more than enough evidence against Lee and Horne (i.e. a fingerprint match and a witness statement describing a confession) to put in the Affidavit, but as for Rayner (Lee's brother and roommate), a man with a history of committing the crime of robbery, he only had a DNA report that provided circumstantial evidence at best. Detective Dutter knew there was at least one other perpetrator that had not been identified. Perhaps he believed that circumstantially it was more likely than not that Rayner was the shadowy, elusive third man and that he could strengthen his Affidavit of Probable

Cause by simply directing the Magistrate Judge's attention to the only other person that had a personal connection with Lee. Again, this is a question for the jury as it seeks to determine whether Plaintiff has met his burden of proof.  All that we know for certain is that months after the DNA report was created, Det. Dutter excludes the exculpatory information in the Affidavit of Probable Cause that would clearly articulate that there were at least three DNA profiles on the t-shirt, and that exclusion ultimately made it appear that Rayner put the DNA on the t-shirt during the crime. Thus, out of this act, probable cause was crafted, and Det. Dutter had his third suspect. And notably, Det. Dutter provides no explanation for why he did not include the omitted facts. (Pl.'s Ex. B, p. 15-19). Having already determined that a jury could find that this decision was a reckless disregard of Rayner's constitutional rights, a jury could infer that Det. Dutter's alleged attempt to bolster his theory was done with malice.

### ii. Qualified Immunity

Defendants argue that Det. Dutter is entitled to qualified immunity, which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). In the Third Circuit, courts conduct a two-step inquiry to determine whether an officer is entitled to qualified immunity. *See Morgan v. Fiorentino*, 811 F. App'x 798, 802 (3d Cir. 2020). First, courts ask "whether the plaintiff sufficiently alleged the violation of a constitutional right." *Id.* Second, when the facts do show a violation, as the Court has already determined a jury could find here, courts ask "whether the right was 'clearly established' at the time of the official's conduct." *Morgan*, 811 F. App'x at 802. "If a court concludes that an officer's conduct did violate a clearly established constitutional right, then it must deny him the protection afforded by qualified immunity." *Curley*, 298 F.3d at 277. At summary judgment, as here, if there are disputed facts that are material to the qualified immunity

determination, then the official is not entitled to the immunity at that stage. *See Ciardiello v. Sexton,* 390 F. App'x 193, 201 (3d Cir. 2010); *see also Q.M. v. Cty. of L.A.*, No. 21-9382, 2025 U.S. Dist. LEXIS 49466, at *26-27 (C.D. Cal. Mar. 18, 2025) ("[T]he facts necessary to establish whether the Deputies committed a constitutional violation are in dispute which makes granting summary judgment on qualified immunity improper.").

For a court to find that a right is clearly established, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016), *as amended* (Mar. 21, 2016). The clearly established right "must be particularized to facts of the case," rather than "defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017). Absent this particularity, qualified immunity would become "a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* Thus, "for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Mammaro*, 814 F.3d at 169.

In this Circuit, by the time the Affidavit was submitted in 2012, and when the Grand Jury was convened in 2013, there is no question that Rayner had a "right to be from prosecutions on criminal charges that lack probable cause." *Andrews*, 853 F.3d at 705 (citing *Donahue v. Gavin*, 280 F.3d 371, 380 (3d Cir. 2002)). This right was "grounded in well-settled law and thus, on the record of this case, 'it would be clear to a reasonable officer that [Det. Dutter's] conduct was unlawful in the situation he confronted.'" *Andrews*, 853 F.3d at 705 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Defendants argue that the Third Circuit's decision in *Kelly v. Borough of Carlisle* requires this Court to conclude that Det. Dutter is entitled to qualified immunity because his decision to omit information was done in reliance of advice from prosecutors. 622 F.3d 248 (3d Cir. 2010). In *Kelly*, the Third Circuit explained when to apply qualified immunity if an officer's decision was guided by legal advice:

> Accordingly, we hold that a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause. That reliance must itself be objectively reasonable, however, because "a wave of the prosecutor's wand cannot magically transform an unreasonable probable cause determination into a reasonable one." *Id.* at 34. Accordingly, a plaintiff may rebut this presumption by showing that, under all the factual and legal circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice.

*Id.* at 255-256. Contrary to Defendants' suggestion, *Kelly* does not establish a *per se* rule granting qualified immunity when a decision is made in reliance on prosecutorial advice. Instead, Rayner "may rebut the reasonableness of the officers' reliance—and therefore their presumptive immunity—by establishing that 'the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Handy v. Palmiero*, 836 F. App'x 116, 119 (3d Cir. 2020) (quoting *United States v. Pavulak*, 700 F.3d 651, 663–64 (3d Cir. 2012)). Here, as explained when the omitted facts are added to the reconstructed Affidavit and into Det. Dutter's testimony at the Grand Jury, a jury could find that no reasonable officer would find that probable cause existed against Rayner. Because there is a factual dispute

with respect to the existence of probable cause, it is premature to decide whether Det. Dutter's reliance was objectionably reasonable, thus precluding this Court from entitling Det. Dutter to qualified immunity. *See Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) ("Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury."). Absent qualified immunity, summary judgment is denied for Count I and Count V.

### 2. Due Process Deprivation

Next, Rayner claims that Det. Dutter fabricated evidence, violating his due process rights under the Fourteenth Amendment. Defendants argue that the claim fails because there was no fabricated evidence, and even if there was, Rayner, through his counsel at trial, was aware of the alleged fabricated information. (Def.'s Brief, p. 23-24). In response, Rayner explains that Det. Dutter's pre-trial conduct—the omissions in the Affidavit and in Det. Dutter's testimony to the Grand Jury—is "the fabricated evidence [that] was used to evade [his] right to due process." (Pl.'s Brief, p. 20). Further, Rayner directs the Court to *Black v. Montgomery County*, 835 F.3d 358 (3d Cir. 2016) to explain that "[t]he fact that this evidence was evaluated at trial does not cure the constitutional injury." (Pl.'s Brief, p. 20).

In *Halsey*, the Third Circuit clarified that "a state actor can be liable on a stand-alone claim for fabrication of evidence" under the Fourteenth Amendment, instead of the fabrication allegations only proceeding as "an aspect of a malicious prosecution claim." 750 F.3d at 289. When a criminal defendant "has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under § 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted." *Id.* at 294. A few years later, in *Black*, the Circuit explained that

there was "no meaningful reason why due process protections precluding fabricated evidence should turn on whether or not one is convicted at trial," so the Circuit extended the use of this claim to defendants whose criminal trials ended in an acquittal. *Id.* at 370, 372. The constitutional source of this claim is the Fourteenth "Amendment… for two reasons:" (1) "[I]ts due process guarantee ensures criminal defendants a fair trial;" and (2) "[I]t guards against unlawful seizures post-conviction." *Mervilus v. Union Cnty.*, 73 F.4th 185, 193-194 (3d Cir. 2023).

Here, Rayner's criminal trial ended in a conviction, *see Rayner*, 2023 WL 1433610, at *1, so the Court is guided by *Halsey*, not *Black*. *See Bracken v. Cnty. of Allegheny*, 760 F. App'x 81, 85 (3d Cir. 2019) ("As previously discussed, however, [plaintiff] was not acquitted of the criminal charges. Rather, the undisputed public record reveals that he paid restitution and the charges were withdrawn as a result. Black is therefore inapposite.") (internal citations omitted). Even though Rayner was granted a writ for habeas corpus from the District Court, as ordered by the Third Circuit, his original trial concluded in a conviction, putting the analysis of his claim under *Halsey*. *See, e.g, Lazar v. City of Philadelphia*, No. 24-907, 2025 WL 886952, at *6 (E.D. Pa. Mar. 21, 2025) (analyzing fabrications at trial using Halsey where a defendant was convicted and later granted habeas relief). That said, Rayner's fabrication claim fails the standard articulated in *Halsey*.

Rayner cannot provide evidence that there is a reasonable likelihood that, without the use of that evidence, he would not have been convicted. To Defendants' point, the alleged "fabricated evidence" here was presented at trial. Samuel Stretton, Rayner's attorney during the criminal trial, testified that he had the DNA report and knew the omitted DNA information. (Def.'s. Facts ¶ 41). Stretton brought out this information to the jury on cross examination of the DNA expert and in his closing argument at trial. (Def.'s. Facts ¶ 44). Rayner does not dispute these facts, which, on

their face, demonstrate that a jury heard this evidence and chose to convict Rayner. In fact, the

jury's evaluation of this evidence was the basis of the Third Circuit's order to grant Rayner habeas

relief. *See Rayner*, 2023 WL 1433610, at *1. The Circuit found that "the evidence introduced at

trial was insufficient to support a finding of guilt beyond a reasonable doubt," which included the

omitted DNA evidence. *Id.* However, the Circuit's determination in Rayner's habeas case does not

satisfy the *Halsey* standard for a due process claim. Instead, it affirms that a jury already heard this

evidence and convicted Rayner, precluding Rayner's ability to demonstrate a reasonable likelihood

of non-conviction in the face of the conviction that already occurred. Accordingly, summary

judgment for Rayner's due process claim (Count II) is granted. *See, e.g. Brackbill v. Ruff*, No. 22-

1628, 2023 WL 5447271, at *4 (3d Cir. Aug. 24, 2023) ("And even if Brackbill had produced

evidence of fabrication, Ruff would still be entitled to summary judgment because the challenged

testimony could not have affected the traffic court verdict.").

### 3. Civil Conspiracy

Det. Dutter also contests the civil conspiracy claim that Rayner asserts against him. A civil

conspiracy claim under Section 1983 requires a plaintiff to establish the following: "(1) The

existence of a conspiracy; (2) An agreement or meeting of the minds to violate constitutional or

civil rights; and (3) A deprivation of those rights in furtherance of the conspiracy." *Thomas v. City

of Philadelphia*, 290 F. Supp. 3d 371, 387 (E.D. Pa. 2018); *see also Jutrowski v. Twp. of Riverdale*,

904 F.3d 280, 293–94 (3d Cir. 2018) ("To prevail on a conspiracy claim under § 1983, a plaintiff

must prove that persons acting under color of state law "reached an understanding" to deprive him

of his constitutional rights."). Det. Dutter argues that there was no constitutional violation and that

there was no agreement to deprive Rayner of his constitutional rights. (Def.'s Brief, p. 33). Having

already ruled that a jury could find a constitutional violation, the Court will address whether there was an agreement.

To establish "agreement" under this claim, Rayner "must demonstrate that 'the state actors named as defendants in the complaint somehow reached an understanding to deny [him] his rights.'" *Jutrowski*, 904 F.3d at 295. Where there is no "direct proof," a "meeting of the minds or understanding or agreement to conspire can be infer[ed] from circumstantial evidence." *Id.* (internal quotations omitted). This "evidence may include that the alleged conspirators 'did or said something ... to create an understanding,' 'the approximate time when the agreement was made, the specific parties to the agreement[,] the period of the conspiracy, or the object of the conspiracy.'" *Id.* Here, as mentioned, several attorneys from the Chester County District Attorney's Office "reviewed and approved the language and contests of [the] Affidavit of Probable Cause, prior to the submission to the magistrate." (Def.'s Exhibit D, Hogan Affidavit, ECF No. 30-5, p. 3; Def.'s Exhibit E, Noone Affidavit, ECF No . 30-6, p. 3; Def.'s Exhibit F, Gaza Affidavit, ECF No. 30-7, p. 3). This review and approval process, indicating that state actors in the District Attorney's office "knew about [the] misrepresentations," could lead a jury to reasonably infer that there was an agreement to deprive Rayner of his constitutional rights. *Cf. Harvard v. Cesnalis*, 973 F.3d 190, 207 (3d Cir. 2020) (finding no civil conspiracy because there was no evidence that one defendant knew about the misrepresentations made by the other). Accordingly, with respect to the conspiracy claim, summary judgment for Defendants is denied.

**B.  *Monell* Liability**

Rayner asserts a Section 1983 claim against Chester County through *Monell* liability. A plaintiff can advance such a claim by demonstrating that their injuries were either (1) caused by "an unconstitutional policy or custom of the municipality;" or (2) "that they were caused by a

failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (internal quotation marks omitted). Rayner invokes the later theory, which applies to failures or inadequacies by municipalities related to the training, supervision and discipline of its police officers. *See id.* Rayner specifically argues that Chester County was deliberately indifferent to training Chester County detectives on probable cause.

Generally, "a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of failure to train." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (insertions accepted and internal quotation marks omitted). A municipality's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 407 (1997)). However, in select cases, "a single constitutional violation may amount to deliberate indifference." *Wright v. City of Philadelphia*, 685 F. App'x 142, 147 (3d Cir. 2017). To establish liability in such cases, a plaintiff must demonstrate the following:

> "[I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."

*Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). Stated otherwise, Rayner must demonstrate "that the risk of injury was a 'highly predictable consequence' of the failure to train." *Williams v. Ponik*, 822 F. App'x 108, 113 n. 24 (3d Cir. 2020). A single-violation can only demonstrate deliberate indifference "in a narrow range of circumstances," whereas the Supreme Court has only provided a hypothetical example of this liability—"if a city armed its police with

guns and set them loose without any legal training on when to use them." *Hightower v. City of Philadelphia*, 130 F.4th 352, 357 (3d Cir. 2025) (citing *City of Canton*, 489 U.S. at 390 n.10).

Rayner attempts to demonstrate a failure to train claim seemingly under both a pattern-of-violations theory and a single-violation theory. He points the Court to the following evidence: (1) a single prior allegation of police misconduct in *Brison v. Police Officer Tester*, (2) the deposition testimony of Det. Dutter and Sheriff Kevin Dykes, who was a Lieutenant in the Major Crime Unit of the Chester County Detectives at the time Rayner was prosecuted and convicted; and (3) an expert report from Christopher Chapman on the police practices in this case. (Pl.'s Brief, 22-31). Review of this evidence, whereupon all reasonable inferences are construed in Rayner's favor as the non-moving party, leads this Court to find that Rayner cannot establish liability under *Monell*.

First, the single case that Rayner points the Court to cannot sufficiently demonstrate a pattern that would have put Chester County on "notice that specific training was necessary to avoid this constitutional violation." *Connick v. Thompson*, 563 U.S. 51, 62-63 (2011) ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."). In *Brison v. Police Officer Tester*, the alleged notifying case, Dale Brison was arrested and convicted for a 1990 kidnapping and rape, whereupon there was DNA evidence that was available for testing, but detectives and prosecutors failed to do so despite Brison's repeated request while awaiting trial. *See* No. 94-2256, 1994 WL 709401, at *2-3 (E.D. Pa. Dec. 21, 1994). Two years after Brison was convicted, DNA testing was completed and exonerated Brison. *Id.* at *3. This failure to perform a DNA test formed the basis of Brison's Section 1983 claims in his lawsuit. *Id.* While this case involves DNA, it does not involve the failure to provide complete information about DNA evidence in an affidavit of probable cause or in one's grand jury testimony. The failure

to conduct DNA testing is not analogous to a failure to adequately explain DNA results in a probable cause analysis. Accordingly, "[b]ecause [this] incident[ is] not similar to the violation at issue here, [it] could not have put [Chester County] on notice that specific training was necessary to avoid this constitutional violation." *Connick*, 563 U.S. at 62–63. Moreover, even if it was analogous, one prior case is not a pattern that would put Chester County on notice.[9] *See, e.g. Carroll v. Lancaster Cnty.*, 301 F. Supp. 3d 486, 511 (E.D. Pa. 2018) ("Two isolated incidents do not constitute a pattern, policy, or custom of failing to properly train."); *McAndrew v. Northumberland Cnty.*, No. 4:22-CV-00834, 2023 WL 5351994, at *8 n. 88 (M.D. Pa. Aug. 21, 2023) (finding one prior incident is not sufficient to demonstrate a patter for *Monell* purposes); *cf. Thomas v. City of Philadelphia,* No. 17-4196, 2019 WL 4039575, at *20 (E.D. Pa. Aug. 27, 2019) (holding that eight prior incidents was enough to establish a pattern of misconduct); *Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) (holding that five complaints of similar excessive force incidents was sufficient to establish a pattern).

Next, Rayner highlights deposition testimony and an expert report to demonstrate that inadequacies in Chester County's training makes the municipality liable. Det. Dutter testified that he did not know that he had to include exculpatory information in an affidavit of probable cause. (Pl.'s Ex. B, p. 22-25). Christoper Chapman's review of this testimony, and additional evidence in the case, led him to opine that Det. Dutter's understanding of DNA evidence and probable cause is below the level of a reasonable officer. (Pl.s' Exhibit E, Chapman Report, ECF No. 36-5 ("Pl.'s Ex. E"), p. 4-5). Rayner argues that Det. Dutter's deficiency can be attributed to inadequate training

---

[9] In Defendants' opening brief, they mention another case that they anticipated Rayner would use to establish a pattern— *Teeple v. Carabba*, 2009 U.S. Dist. LEXIS 119937 (E.D. Pa 2009). (Def.'s Brief, p. 8). Rayner makes no mention of the case in his briefing, so the Court will understand this decision as abandoning the use of said case. Accordingly, the Court does not analyze it here.

by Chester County. He points the court to Sheriff Dykes testimony, where he makes the following representations about the training in Chester County:

- New detectives come in and go through an orientation period. In their specific office, they are then provided directives (on clipboards) and are told to familiarize themselves with the information. (Pl.'s Exhibit F, Dykes Deposition, ECF No 36-6 ("Pl.'s Ex. F"), p. 24-25).

- Changes in the law are communicated in "all-hands meetings." This information sometimes would be communicated by the prosecutor's office. Usually, the policy changes were presented verbally and then communicated in writing, but the policies were not always reduced to writing. (Pl.'s Ex. F, p. 57-58).

- He has no knowledge of there ever being a training on what the constitutional minimal standards of probable cause during his tenure. (Pl.'s Ex. F, p. 154-155).

- He does not recall if there was a written policy that defined probable cause. (Pl.'s Ex. F, p. 74).

- When Chester County hired a detective, the detective already had experience with investigations, so there was a presumption that they knew what they were doing, including with respect to probable cause. (Pl.'s Ex. F, p. 75-76).

- It was a regular practice for Chester County detectives to meet with prosecutors to make probable cause determinations and prepare their affidavit of probable cause, including determining when to reveal exculpatory information. (Pl.'s Ex. F, p. 98-101).

- It was a policy that no arrest warrant would be submitted for judicial approval until a prosecutor had given it final approval. (Pl.'s Ex. F, p. 49-50).

In review of this testimony, and other evidence, Christopher Chapman opined that "it was foreseeable that Detective Dutter and other detectives would continue to request warrants without

first making an independent determination if probable cause existed based upon the totality of the investigators and departments knowledge regarding criminal cases." (Pl.'s Ex. E p. 91).

Contrary to Rayner's position, this evidence does not demonstrate that this case falls within the narrow circumstances where a single incident can show Chester County's deliberate indifference. Sheriff Dykes testimony reveals that he was not aware of a training on probable cause and that Chester County did not define the standard in its policies. If Chester County's deliberate indifference were based on these facts alone, then a jury could reasonably find that the risk of a constitutional violation was obvious. However, the rest of Sheriff Dykes' testimony paints a different picture. Sheriff Dykes points out several practices by Chester County that created safeguards for potential constitutional violations: (1) they hired detectives that had experience conducting investigations and determining probable cause; (2) their affidavits of probable cause were reviewed by prosecutors prior to its submission to a judge; and (3) there were meetings where updates on the law were provided. Because of these practices, it would not be obvious to Chester County that there would be a constitutional violation. While a jury could infer negligence on the part of Chester County for relying on these practices, the evidence would not allow them to find that Rayner's injury was a "highly predictable consequence of the municipality's failure to train and supervise its officers." *Thomas*, 749 F.3d at 225 (quoting *Connick*, 563 U.S. at 63-64).

Accordingly, Rayner cannot demonstrate that Chester County was deliberately indifferent, so summary judgment is granted for the *Monell* claim.

## C. Punitive Damages

Finally, Defendants argue that the Court should deny Rayner's request for punitive damages for his claims against Det. Dutter. (Def.'s Brief, p. 34). Individual municipal officials can be held liable for punitive damages under Section 1983. *See Abraham v. Pekarski*, 728 F.2d 167,

172 (3d Cir. 1984). In this Circuit, "[a] court cannot impose a punitive damages award against an official acting in his or her individual capacity unless the actor's conduct is, at a minimum, reckless or callous." *Startzell v. City of Philadelphia*, No. 05-05287, 2007 WL 172400, at *22 (E.D. Pa. Jan. 18, 2007) (citing *Brennan v. Norton,* 350 F.3d 399, 428-29 (3d Cir.2003)). Therefore, "[i]t is sufficient for the plaintiff to show either that the defendant acted . . . with actual knowledge that he was violating a right 'secured by the Constitution and laws,' or that the defendant acted with reckless disregard of whether he was thus violating such a right." *Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir. 1978). However, "despite its utility as a deterrent, the punitive damage remedy must be reserved, we think, for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief." *Id.* Here, the Court has outlined in detail that a jury could find that Det. Dutter recklessly disregard the truth in violation of Rayner's constitutional rights. Accordingly, such a finding could allow a jury to find that punitive damages are warranted here, so summary judgment for Defendants on this issue is denied.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part.

An appropriate Order follows.

**IT IS SO ORDERED.**

BY THE COURT:

/s/ John Milton Younge
**Judge John Milton Younge**